STATE OF IOWA, appellee, v. CLAUDE S. HOLLINGSWORTH, appellant.

No. 49006.

(Reported in 81 N.W.2d 27)

764

FEBRUARY 5, 1957.

REHEARING DENIED APRIL 5, 1957.

Thomas O. Tacy, of Council Bluffs, for appellant.

Dayton Countryman, Attorney General, and Dudley C. Lowry, Assistant Attorney General, Matt Walsh, County Attorney, and Charles M. Roe, Assistant County Attorney, both of Council Bluffs, for appellee.

SMITH, J.—The statute called "Embezzlement by agents" (section 710.5, Iowa Code, 1954) under which defendant was indicted and convicted, is long and somewhat involved in its language. So far as applicable here it provides:

"If any officer, agent, clerk, or servant of any corporation or voluntary association * * * or if any * * * other person who in any manner receives or collects money * * * for the use of and belonging to another, embezzles or fraudulently converts to his own use * * * any money or property of another * * * which has come to his possession or under his care in any manner whatsoever, he is guilty of larceny."

The instrumentality by or through which the State claims defendant operated was called "Declaration of Trust of Midland Acceptance Discount Trust, Council Bluffs, Iowa" (we shall for brevity call it "Midland Trust"). It was filed in the County Recorder's office March 26, 1947. It recites that it is made by "C. S. Hollingsworth, Trustee" and throughout the document repeatedly refers to him as Trustee. In section 7 it provides "the Trustee shall be known and designated, so far as practicable, as the MIDLAND ACCEPTANCE DISCOUNT TRUST * * * and under that name * * * shall, to the same extent as a natural person, conduct all business * * *."

The document consists of twenty numbered sections. The fifth, which is headed "purposes", is subdivided into three subsections which in substance provide:

"(a) To engage in * * * the business of acquiring, holding, selling, mortgaging or pledging promissory notes, chattel mortgages, real-estate mortgages"; and other enumerated forms of real and personal property not necessary to repeat here.

"(b) To borrow money upon demand notes" and "other securities held by the trust, and to pledge specific or all assets held by the trust, for the repayment" of money borrowed. There

are details as to the demand notes to be issued by the trust, varying in interest rate (from 7% down to 1%) as the demand time lowers from 545 to 30 days, the longer time notes bearing the higher interest rates.

"(c) To do any and all things in this declaration set forth as powers * * * to the same extent * * * as any natural person might or could do."

Section 2 authorizes and directs the "MIDLAND ACCEPTANCE DISCOUNT TRUST, C. S. HOLLINGSWORTH, TRUSTEE," to issue "Class A Trust Certificates" in units of $1.00 par value bearing 7% interest per annum with which to pay legal services and expenses in initiating the trust, the holders to share in net profits according to their respective holdings. These "Certificates" and the "demand notes", issued under section 5(b), seem to be the only obligations the "Midland Trust" was to issue.

Other provisions of the document will be hereinafter referred to as we proceed.

The indictment, returned January 30, 1954, charges defendant, "Did, as Trustee * * * receive the sum of $53,236.19, as the property and for the use of MIDLAND ACCEPTANCE DISCOUNT TRUST of Council Bluffs, Iowa. That * * * while he was acting as Trustee of Midland * * *" he "did fraudulently convert to his own use, and take and secrete, with intent to embezzle or convert to his own use, the sum of $52,561.70 without the consent of the MIDLAND ACCEPTANCE DISCOUNT TRUST, the owner of said money."

A study of the trust instrument confirms the State's characterization of it as "unique." Defendant's wife held all the original Trust Certificates, "the owners and holders of over one half" of which were authorized "to designate succeeding trustees"; and defendant, as trustee, was not only authorized to issue the certificates, but also he and his "successors" were vested with "the exclusive management and control" of the property, and authorized to "make all contracts in relation to the operation and conducting of the business * * *." It was a completely one-man institution. Defendant had absolute control.

Defendant, Hollingsworth (65), had been in the small loan and insurance business some time prior to the filing of this

"Trust." He argues that he "contributed contracts totaling some seven or eight thousand dollars, some office equipment and customer and investor lists of considerable value to the assets of the * * * trust"; also that the Declaration did not provide for any salary for himself and that his wife "held all the Trust Certificates"; that "from time to time, the defendant, who contributed his going business to the assets of the Trust, withdrew certain amounts from the assets for living and travel expenses."

He contends the reports of "auditors for, both sides" showed he "had settled and relieved" the Midland of liability on $18,000 "in notes to investors" for which his own auditors gave him full credit but the State auditors credited him only for $7312.94, "the amount he contributed to the Trust when it was organized"; and "no credit whatever for his six years service * * *. All items for defendant's personal use withdrawn by him were treated * * * as wrongfully converted."

In the summer of 1953 the Midland Trust went into receivership at the suit of the payee of a "demand note" (or notes) who had become a "customer." That circumstance may have precipitated this criminal prosecution.

The State's evidence consists principally of the testimony of holders of notes of the Trust, presumably "demand notes" under section 5(b) of the "Declaration", and of certified public accountants who examined such books as were kept by the Trust (the defendant's); of the testimony of two accountants and of defendant himself.

The defendant pleaded not guilty, was convicted and sentenced, and now brings this appeal.

I. In various ways defendant argues that there was here no trust relationship or agency within the purview of the statute; that "the indictment fails to plead Midland is a partnership, joint-stock company, corporation, association or any other organization legally capable of holding or owning property"; and that the trial court erred in admitting the testimony of seven investors or customers as to defendant's representations in inducing them so to invest. It is argued they were mere creditors, not beneficiaries of a trust.

We deem this question of the relationship of Midland

768

Trust to its investors to be the crux of the defense. What is the nature of this document filed by defendant? It may be impossible to classify the Midland Trust under any of the names suggested by defendant. Fortunately such classification is not necessary. But it *is* necessary to conviction that it be shown the money defendant used was not his own but held in trust for some other person or persons, and that he was not misled by the name given it in the indictment.

Defendant testified: "Before entering into being Trustee of this Trust, I was in the insurance and finance business *for myself*." (Emphasis supplied.) He apparently realized that in filing the "Declaration" he was creating a relationship in which he was handling the property of someone else. He uses the terms "trustee" and "cestui que trust." We think that was the intent—the purpose—of the instrument he filed; and that it must be so construed here, and that as so construed he comes within the purview of Code section 710.5. He created for himself a sort of personality apart from his own natural individuality—a trusteeship that stood between his customers who invested, and himself who gained possession of and used the property as his own. We think defendant cannot successfully argue that the "Midland Trust" he set up by the Declaration is incapable of "holding or owning property." The document itself makes such argument untenable. It is true that in a sense the Trust *is* defendant himself. But it is nevertheless an individuality distinguishable from himself.

The relationship of the payees of the "demand notes" to the Trust itself is sufficiently defined in section 6 of the document to dispel any notion that they were mere "creditors." It provides: "That the said Trustee * * * shall hold all property or funds * * * conveyed to the said Trustee * * * in trust for the purposes * * * and for the benefit of the payees of all demand notes executed by this trust, as a group and as a whole, and for no such payee as an individual only, and it is hereby expressly declared that a trust and not a partnership is hereby created; that neither the Trustee nor the cestuis que trustent shall ever be liable hereunder as partners or otherwise, but that for all debts the Trustee shall become liable as such to the extent of the trust funds only."

We must deny any contention based on the premise that the investors in this Midland Trust were mere creditors and that there was error in permitting them to testify as to the method by which they were induced to entrust their funds with it.

Nor is there any variance between the *charge* and the *proof* as to the ownership of the converted funds. The indictment alleges they were being held "as the property and for the use of" Midland Trust; the proof is that Midland held the legal title, but in trust for investors "as a group" who held the beneficial title. Defendant was not misled by the description in the indictment. He knew what property he was accused of embezzling. Having devised the plan he knew Midland had a qualified ownership of the funds. Any arguable misnomer of the property by the indictment was without prejudice. State v. Goode, 68 Iowa 593, 595, 27 N.W. 772.

II. This statute (Code section 710.5) has stood practically unchanged (but under different Code section numbers) for many years. It is of course designed to cover and circumvent any plan or scheme devised by the ingenuity of men to accomplish embezzlement, and yet stay within the law. The editorial name "Embezzlement by agents" may not adequately describe it. But its text leaves no room for doubt. Neither the name of the statute, nor of the document involved here, is conclusive of the relationship created.

Defendant filed the "Declaration" for his own purposes. We must take it as written so far as possible. We do not know what the words "Acceptance Discount Trust" mean. They seem meaningless. But the document as a whole quite clearly sets up a sort of business trust which holds title to its property in trust for the investors as a group.

Humpty Dumpty told Alice in Wonderland "When I use a word it means just what I choose it to mean—neither more nor less." But Humpty himself had to caution "The question is which is to be master—that's all."

In 1905 this court said that to hold an officer of a corporation liable for fraudulent misappropriation of funds of a customer, entrusted to the corporation, it must be charged and proven that the general business of the corporation was illegal,

or that the misappropriation was with the knowledge or direction of the officer with criminal intent. State v. Carmean, 126 Iowa 291, 102 N.W. 97, 106 Am. St. Rep. 352.

We painstakingly said, in that opinion, the "plain purpose of the statute is to provide, with reference to the officers of corporations, that they shall be criminally liable for the fraudulent conversion of the money or property of the corporation just as agents * * * of a private person are liable for a like fraudulent conversion of the money or property of their employers, or as any person who receives money or property for the use of and belonging to another is criminally liable for fraudulent conversion * * * of money or property thus intrusted to him." And then we added: "The purpose * * * is to punish those who in a fiduciary relation receive and fraudulently convert money or property intrusted to them, or which comes into their hands by virtue of such relationship." 126 Iowa at page 295 et seq., 102 N.W. at page 98.

That case concerned the representative of a *corporation;* but the statute also expressly includes "any officer * * * of any * * * voluntary association"; and *"any * * * other person who in any manner receives"* property "for the use of and belonging to another," and who "embezzles or fraudulently converts" it to his own use. (Emphasis ours.) We deem the statute covers the Midland Trust sufficiently for the purpose involved here.

III. While we need not name the relationship created by this singular "Declaration", some classification is probably helpful in order to determine its nature, by comparison with other cases in which names have been adopted. It must be at least conceded that it was intended to create a business trust.

In Brown v. Bedell, 263 N. Y. 177, 186, 187, 188 N.E. 641, 643, the New York Court of Appeals in 1934 said the true test of a business trust "seems to be to determine whether the relation between the parties is that of principal and agent or trustee and beneficiary; whether the subscribers are separated from direct interest ownership and control of the property and affairs of the trust. A trustee is a principal, not an agent in the management of the trust property." (Citing Taylor v. Davis, 110 U. S. 330, 335, 4 S. Ct. 147, 28 L. Ed. 163.)

Continuing the quotation from Brown v. Bedell: "Although the test is plain, the difference is not always entirely clear between agreements where the subscribers are associated together by the terms of their agreement as principals owning their contributions to the pool or trust, and giving to their agents mere power to act for them, and agreements whereby the property becomes the property of the trustees and the subscribers have no rights except a right to have the property managed for their benefit", citing Williams v. Inhabitants of Milton, 215 Mass. 1, 8, 102 N.E. 355; Bouchard v. First People's Trust, 253 Mass. 351, 148 N.E. 895.

And still quoting the New York case: "Whether the syndicate is the one or the other depends upon the way in which the trustees are to conduct the affairs committed to their charge. If they act as principals, owners of the sums subscribed, free from the control of the subscribers, a trust is created." See 12 C. J. S., Business Trusts, section 1. The rights and liabilities of the respective parties are determined from the provisions of the Declaration of Trust. 12 C. J. S., Business Trusts, section 6.

IV. What we have said disposes of practically every contention made by defendant on appeal. Some complaint is urged against Instruction No. 12 as being erroneous and prejudicial. It in effect advised the jury that defendant's legal title to the "trust funds" gave him no right to use any part for his own "sole and only benefit."

But the court followed it by the admonition that it "does not mean * * * there is any presumption against the defendant as to any of the elements involved in the offense. He is, as you have been instructed, presumed to be innocent in every particular."

The argument is that the first part was erroneous (which we do not concede) and the second part "impotent to correct its prejudicial effect" in view of defendant's admission "he used some of the trust funds to live on to sustain himself during the six years that he devoted his time to the management of the trust."

He filed no request for an instruction, nor any objection

to the one given and now attacked. We find no error in it that can now be urged for reversal. The decision is affirmed.—Affirmed.

All JUSTICES concur except PETERSON, J., who takes no part.