NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific* *Reporter*. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| HAROLD EVAN SIMON, | Court of Appeals No. A-11002 |
| Appellant, | Trial Court No. 3AN-10-10229 CR |
| v. | |
| | O P I N I O N |
| STATE OF ALASKA, | |
| Appellee. | No. 2453 – May 8, 2015 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: Kelly R. Taylor, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Ann B. Black, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Hanley, District Court Judge.[*]

Judge MANNHEIMER.

The earliest, most classic definition of theft is laying hold of property that you know belongs to someone else and carrying it away without permission, with the

_____

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

intent to permanently deprive the owner of the property. [1] The present case requires us to examine how this general notion of theft applies to modern retail stores — stores where customers are allowed to take merchandise from the shelves or display cases, and walk around the store with these items, until they ultimately pay for the items at a check-out station.

The State contends that if a person intends to take the property without paying for it, then the crime of theft occurs at the moment the person removes an article of merchandise from a shelf or display case within the store. The defendant, for his part, contends that the crime of theft is not complete until the person physically leaves the store.

For the reasons explained in this opinion, we conclude that the true answer lies in between the parties' positions: In the context of a retail store where customers are allowed to take possession of merchandise while they shop, the crime of theft is complete when a person, acting with the intent to deprive the store of the merchandise, performs an act that exceeds, or is otherwise inconsistent with, the scope of physical possession granted to customers by the store owner.

In the present case, the parties disagreed as to precisely where the defendant was located when he was stopped by the store employee: whether he had reached the outer door of the store, or whether he was still inside the vestibule leading to that outer door, or whether he was merely approaching that vestibule. But it was undisputed that the defendant had already gone through the check-out line, and that he had paid for a

---

[1] "Larceny is the trespassory taking and carrying away of the personal property of another with intent to steal the same. It was one of the few felonies under the common law of England." Rollin M. Perkins and Ronald N. Boyce, *Criminal Law* (3rd edition 1982), p. 292.

couple of inexpensive items while, at the same time, either hiding or disguising other items of merchandise — items that he then carried toward the exit.

Even viewed in the light most favorable to the defense, this conduct was inconsistent with the scope of physical possession granted to customers by the store owner. This conduct therefore constituted the *actus reus* of theft — the physical component of the crime. This conduct, coupled with the mental component of the crime (intent to deprive the store of the property), made the defendant guilty of theft. We therefore affirm the defendant's conviction.

*Underlying facts*

The defendant, Harold Evan Simon, went into a Walmart store in Anchorage. Like many other retail merchants, Walmart allows its customers to exert control over its merchandise before making a purchase: customers are allowed to roam the aisles of the store, to handle and examine the items that are offered for sale, and to take these items with them (either in their hands, or in a basket or shopping cart) as they walk through the store, before going to the cash registers or scanning stations to pay for these items.

While Simon was walking through the Walmart store, he took a jacket from a sales rack, put it on, and continued to wear it as he walked through the store. Simon also took a backpack and started carrying it around. At some point, Simon placed several DVDs in the backpack. Simon also picked up a couple of food items. Finally, Simon went to the row of cash registers. He paid for the food items — but he did not pay for the jacket, the backpack, or the DVDs hidden in the backpack.

Simon then left the cash register area and headed for the store exit. Before Simon reached the exit, a Walmart employee approached him and detained him. Simon

handed the backpack to the employee, and then he removed the DVDs from the backpack. Simon told the Walmart employee, "There you go; there's your stuff. I'm sorry; I was going to sell it." A short time later, the police arrived, and they noticed that Simon's jacket was also unpaid-for. (It still had the Walmart tags on it.)

Based on this incident, and because of Simon's prior convictions for theft, Simon was indicted for second-degree theft under AS 11.46.130(a)(6) (*i.e.*, theft of property worth $50 or more by someone with two or more prior convictions for theft within the previous five years). Simon ultimately stipulated that he had the requisite prior convictions, so the only issue litigated at Simon's trial was whether he stole property worth $50 or more.

The State presented the evidence we have just described. Simon presented no evidence. In his summation to the jury, Simon's attorney focused on potential weaknesses in the State's proof, and he argued that Simon might have been so intoxicated that he lacked the culpable mental state required for theft (the intent either to deprive Walmart of the property or to appropriate the property for himself). Additionally, toward the end of his summation, Simon's attorney suggested that Simon "didn't deprive anyone of property" because "he didn't even enter the vestibule [leading to the final exit door]".

This latter argument mistakenly conflated the "conduct" component and "culpable mental state" component of the crime of theft. The State was not required to prove that Simon *actually* deprived Walmart of its property. Rather, the State was required to prove that Simon exerted control over the property with the *intent* to deprive Walmart of its property (or to appropriate the property to his own use). *See* AS 11.-46.100(1).

But it appears that the defense attorney's argument struck some of the jurors as potentially important — because, during its deliberations, the jury sent a note to the

judge in which they asked about the vestibule. The jury's note read: "At what point does [the] defendant 'exert control over the property of another' [in] reference to the vestibule area ... [and] # 20 of [the jury] instructions[?]"

(The jury instructions informed the jurors, in accordance with AS 11.46.100(1) and AS 11.46.990(12), that before Simon could be found guilty of theft, the State had to prove that Simon "exert[ed] control over the property of another".)

After conferring with the parties, and without objection from Simon's attorney, the trial judge responded to the jury's question as follows:

> The word "property" as used in Instruction 20 refers to the items Mr. Simon is alleged to have taken, and not to any particular area in or around Walmart.

> The issue for you to decide is whether the State proved, beyond a reasonable doubt, that Mr. Simon intended to take the items from Walmart without paying for them, without regard to any particular area where he was confronted by Ms. Mills [the Walmart employee].

> The court also refers you to Instruction 14 [an instruction dealing with the lesser included offense of attempted theft], with the caution that you are to consider all of the instructions as a whole.

Shortly after receiving this reply from the judge, the jury found Simon guilty of theft.

Six days later, Simon's attorney filed a motion for a new trial, arguing that the judge had committed reversible error in his answer to the jury's question. Even though Simon's attorney had not objected to the wording of the judge's answer (indeed, Simon's attorney had actually contributed to the wording of the judge's answer), the

attorney now contended that there was a flaw, amounting to plain error, in the wording of the first sentence of the second paragraph.

According to the defense attorney, that sentence should have been worded, "*One* issue for you to decide ... ", rather than "*The* issue for you to decide ... ", because more than one issue was contested at Simon's trial. The defense attorney pointed out that he had contested the State's evidence regarding Simon's culpable mental state, and that he had also argued that Simon might only be guilty of attempted theft, rather than the completed crime.

A little over three months later, the trial judge denied this motion without comment.

*Simon's initial contention on appeal*

In Simon's opening brief on appeal, he renews his contention that the trial judge committed error by using the phrase, "*The* issue for you to decide ... ", instead of "*One* issue for you to decide ... ".

Simon contends that, in effect, the judge's instruction told the jury that the State had already proved the *actus reus* component of theft — the element of "exerting control" over the property of another — and therefore the jurors did not need to decide this aspect of the case. But Simon's argument ignores the context of the judge's supplemental instruction.

The judge was responding to a jury question that asked, "At what point does [the] defendant 'exert control over the property of another' ... [in] reference to the vestibule area [of the store?]" The jury's question focused on the *actus reus* of the crime (the element of "exerting control over the property of another"), and how the State's

proof of that element might be affected by Simon's physical location within the store when he was apprehended.

The judge's response to this question was to tell the jurors that it did not matter exactly where Simon was located when he was apprehended — that Simon was guilty or innocent of theft "without regard to any particular area where he was confronted by [the store employee]."

In this context (*i.e.*, formulating the answer to a jury question that focused on the specific issue of *actus reus*), it was not error for the judge to use the phrase "the issue for you to decide". (Indeed, the defense attorney perceived nothing wrong with the judge's response until six days later.)

*Our call for supplemental briefs on how to define the <u>actus reus</u> of theft in this context, and the parties' positions*

Although the judge's answer to the jury was not flawed in the way Simon contended in his opening brief, the judge's answer was potentially flawed in another way — because, depending on how the phrase "exert control over property of another" is defined in the context of a retail store, Simon's location at the time he was apprehended might possibly be the factor that distinguished a completed act of theft from an attempted theft.

We therefore asked the parties to submit supplemental briefs on the issue of what, exactly, is the *actus reus* of theft in the context of a retail store where customers are allowed to take possession of items of merchandise while they shop.

In its supplemental brief, the State argues that if a person intends to take an article of merchandise without paying for it, then the crime of theft is complete at the moment the person first "exerts control" over that merchandise — by which the State means the act of taking the item from its shelf or display case. Simon, on the other hand,

argues that even if a person takes an article of merchandise off the shelf with the intent to steal it, the crime of theft is not complete until the person physically leaves the store with the merchandise.

*Why we conclude that, in this context, Alaska's definition of theft requires proof that the defendant did something with the merchandise that was outside the scope of, or otherwise inconsistent with, the possession authorized by the store*

The general definition of the crime of theft is contained in AS 11.46.100(1). Under this definition, theft occurs if a person "obtains the property of another", acting with the intent "to deprive another of property or to appropriate property of another to oneself or a third person".

For purposes of the issue raised in Simon's case, the key portion of this definition is the word "obtains". This word is defined in AS 11.46.990(12); the relevant portion of that definition is: "to exert control over property of another".

In situations where the accused thief had no right at all to exert control over the other person's property, this definition expresses our traditional notion of theft. It describes what most of us think of when we hear the word "theft" — situations where a thief picks up someone else's property and makes off with it.

The State contends that this definition applies equally to the circumstances of Simon's case. The State argues that a person in a retail store "exerts control" over an item of merchandise when they pick it up and take it from the shelf or display case. Thus, if a person performs this action with an intent to steal the item, the crime of theft is complete — even if the person is apprehended before they ever attempt to leave the store.

It is true that, in common usage, one might say that shoppers "exert control" over the items that they take from the shelves and put in their shopping baskets (or carry in their hands). But the State's proposed interpretation of the statute is inconsistent with the traditional common-law approach to theft.

Our present-day crime of theft covers conduct that, at common law, was viewed as two different offenses: larceny and embezzlement.

The common-law crime of larceny covered classic instances of theft, and it required proof of a "trespassory taking". [2] That is, the government was required to prove that the defendant committed a trespass — violated someone else's property rights — when they exerted physical control over the property.

The English judges were willing to stretch the concept of trespassory taking to cover situations where the defendant acquired possession by fraud — *i.e.*, situations where the owner of the property voluntarily gave possession (but not title) to the defendant because of the defendant's lies. [3] But the common-law crime of larceny did not apply to situations where, in the absence of fraud, the owner voluntarily allowed another person to take possession of the property. [4]

For example, a wealthy person might entrust a butler or maid with daily custody of their silverware, or they might take the silverware to a shop and temporarily leave it with the employees for polishing or cleaning. Or, turning to more modern situations, people who are about to purchase a house or other real estate will ordinarily leave a large sum of money in escrow with a third party (a bank or an escrow company),

---

[2]  *See* Rollin M. Perkins and Ronald N. Boyce, *Criminal Law* (3rd ed.1982), pp. 303-07; Wayne R. LaFave, *Substantive Criminal Law* (2nd ed. 2003), §§ 19.1(a) & 19.2(a), Vol. 3, pp. 57 & 61-65.

[3]  *LaFave*, § 19.2(e), Vol. 3, pp. 68-69.

[4]  *Perkins & Boyce*, pp. 303-07; *LaFave*, § 19.1(b), Vol. 3, pp. 59-61.

with instructions that the money be transferred to the seller if the deal is successful. And the owners of businesses ordinarily entrust their bookkeepers with checkbooks or access codes that allow the bookkeepers to pay bills, pay employees' salaries, and otherwise disburse the company's funds for business purposes.

To cover situations where theft occurred after the owner of the property voluntarily allowed one or more people to exert control over the property for a particular purpose (or range of purposes), a new crime was created: "embezzlement". [5]

In these situations, one might reasonably say that the employees or custodians were already "exerting control" over the owner's property (with the owner's permission) before they stole it. Accordingly, one might argue that these employees or custodians became guilty of embezzlement at the very moment they formed the *mens rea* of the crime — the moment they *decided* to deprive the owner of the property — even if they performed no further action toward this goal.

But one of the axioms of the common law was that a person should not be punished for their thoughts alone. [6] Thus, in prosecutions for embezzlement, proof of the defendant's larcenous thoughts was not enough: the common law required proof that the defendant's *conduct* departed in some way from the conduct of someone who was dutifully upholding the property owner's trust (and that this conduct was prompted by an accompanying intent to steal). The government was required to prove that the defendant exerted *unauthorized* control over the property — *i.e.*, engaged in conduct

---

[5]  *See LaFave*, § 19.1(b), Vol. 3, pp. 60-61; § 19.2(a), p. 62; & § 19.6(a), pp. 99-101.

[6]  *LaFave*, § 6.1(b), Vol. 1, pp. 423-25; § 6.3(a), Vol. 1, pp. 451-54; *Braham v. State*, 571 P.2d 631, 636 (Alaska 1977).

with the property that was inconsistent with the type or scope of control that the property owner had allowed. [7]

When the drafters of the Model Penal Code created the crime of "theft" (a crime that was intended to encompass and modernize the common-law crimes of embezzlement and larceny in its various forms), the drafters expressly included this concept of exerting unauthorized control.

Model Penal Code § 223.2(1), the provision that defines the crime of theft as it relates to movable property, declares that a person is guilty of theft if the person "unlawfully takes, *or exercises unlawful control over*, movable property of another with purpose to deprive him thereof." (Emphasis added) And in Section 2 of the Comment to § 223.2, the drafters emphasized that the crime of theft requires an *unauthorized* taking or an *unauthorized* exercise of control:

> The words "unlawfully takes" have been chosen to cover [all] assumption of physical possession or control without consent or authority ... . The language "exercises unlawful control" applies at the moment the custodian of property begins to use it in a manner beyond his authority ... . The word "unlawful" in each instance implies the [actor's] lack of consent or authority [for the taking or the exertion of control].

American Law Institute, *Model Penal Code and Comments, Official Draft and Revised Commentary* (1962), pp. 165-66.

In *Saathoff v. State*, 991 P.2d 1280, 1284 (Alaska App. 1999), this Court recognized that this provision of the Model Penal Code "appears to be the source of the definition of 'obtain' codified in AS 11.46.990[(12)] — 'to exert control over property of another'."

---

[7] *Perkins & Boyce*, pp. 358-59; *LaFave*, § 19.6(b), Vol. 3, pp. 100-01.

But unlike the vast majority of other states that enacted theft statutes based on the Model Penal Code,[8] the drafters of Alaska's criminal code did not include the words "unauthorized" or "unlawful" when they defined the word "obtain". Instead, the drafters defined "obtain" as simply "to exert control over property of another". *See* Tentative Draft 11.46.990(6), Alaska Criminal Code Revision Subcommission, Tentative Draft, Part 3 ("Offenses Against Property"), p. 98.

There is nothing in the Tentative Draft of our criminal code explaining (or even commenting) on the drafters' omission of "unauthorized" or "unlawful". There is only a derivation note, saying that Alaska's definition was based on the Oregon theft statutes — that it came from Oregon Statute 164.005. *Id*. at 104.

This Oregon statute uses the word "appropriate" rather than the word "obtain" to describe the *actus reus* of theft. But, like Alaska's definition of "obtain", the Oregon definition of "appropriate" does not include the words "unauthorized" or "unlawful":

---

[8]    *See* Alabama Stats. § 13A-8-1(7) ("obtains or exerts unauthorized control over property"); Colorado Stats. § 18-4-401(1)(a) ("obtains or exercises control over anything of value ... without authorization, or by threat or deception"); Hawai'i Stats. § 708-830(1) ("obtains or exerts unauthorized control over property"); Illinois Stats. 720 ILCS 5/16-1(a)(1) (obtaining or exerting unauthorized control over property of another); Indiana Stats. § 35-43-4-2(a) ("exerts unauthorized control over property of another person"); Maryland Stats., Criminal Law, § 7-104(a) ("obtains or exerts unauthorized control over property"); Montana Stats. § 45-6-301(1) ("obtains or exerts unauthorized control over property"); New Hampshire Stats. § 637:3(I)  ("obtains or exercises unauthorized control over the property of another"); Ohio Stats. § 2913.02(A)(1) ("obtain or exert control over ... property ... without the consent of the owner or person authorized to give consent."); Pennsylvania Stats. § 3921(a) ("unlawfully takes, or exercises unlawful control over, movable property of another"); Washington Stats. § 9A.56.020(1)(a) ("wrongfully obtain or exert unauthorized control").

"Appropriate property of another to oneself or a third person" or "appropriate" means to:

(a) Exercise control over property of another, or to aid a third person to exercise control over property of another, permanently or for so extended a period or under such circumstances as to acquire the major portion of the economic value or benefit of such property; or

(b) Dispose of the property of another for the benefit of oneself or a third person.

But even though this statutory language does not expressly include the modifiers "unauthorized" or "unlawfully", the Oregon courts have construed this language to require proof that, when the defendant "appropriated" the property of another, the appropriation was unauthorized or unlawful — in the sense that it constituted a "substantial interference with [another person's] property rights", *State v. Gray*, 543 P.2d 316, 318 (Or. App. 1975), or that it constituted an "unauthorized control of property", *State v. Jim*, 508 P.2d 462, 470 (Or. App. 1973).

The Oregon Court of Appeals' decisions in *State v. Gray* and *State v. Jim* were issued before the Alaska Criminal Code Revision Subcommission drafted our theft provision in 1977. Thus, when the drafters of the Alaska theft statutes composed our definition of "obtain" (based on the Oregon statute), the Oregon courts had already construed their statute to require proof of an *unauthorized* exertion of control (even though the statute did not explicitly mention this requirement).

For these reasons, we hold that Alaska's definition of "obtain", AS 11.46.-990(12)(A), includes a requirement that the defendant's exertion of control over the property was unauthorized. This interpretation of the statute is supported by the principles of the common law, it is consistent with the law of Oregon (the state from

– 13 –
2453

which our statute was immediately derived), and it brings Alaska's law of theft into conformity with the law of every other jurisdiction (at least, every other jurisdiction we are aware of) that has enacted theft statutes based on the Model Penal Code.

*Application of this law to Simon's case*

We have just held that the *actus reus* of theft requires proof, not just that the defendant exerted control over someone else's property, but that this exertion of control was unauthorized. Thus, the supplemental instruction that the trial judge gave to Simon's jury was technically wrong. Depending on the facts of a particular case, it might make a difference where a shoplifter is apprehended — because there might be cases where defendants could plausibly argue that they had not yet taken the merchandise anywhere that was inconsistent with the scope of their implicit authority as customers.

On this point, we wish to point out that even though a defendant's physical location when apprehended may be *relevant* to the issue of whether their exertion of control was unauthorized, physical location is not necessarily determinative. There are other types of conduct that a person can engage in, within the confines of a retail store, that are inconsistent with a customer's scope of authority. See, for example, *State v. T.F.*, 2011WL 5357814 (Wash. App. 2011), where the Washington Court of Appeals upheld the theft conviction of a defendant whose female accomplice hid an item of merchandise under her clothes, even though the defendant and the accomplice never left the store:

> T.F. handed the belt to [the accomplice] R.M., [who,] rather than carrying it in the open, ... exerted unauthorized control over the belt by placing the belt under her shirt and starting toward the store's exit. Concealing the belt in this

way was an act inconsistent with the store's ownership of the item ... . On these facts, the trial court could have found that a third degree theft had been committed.

*T.F.*, 2011 WL 5357814 at *2.

Turning to the facts of Simon's case, we conclude that any technical flaw in the judge's response to the jury was harmless beyond a reasonable doubt.

As we have explained, there was a dispute in Simon's case as to precisely where Simon was located when he was stopped by the store employee. But under any version of the evidence, Simon had already gone through the check-out line — where he paid for a couple of food items while, at the same time, either hiding or disguising the jacket, the backpack, and the DVDs he had taken — and he was headed toward the exit when he was apprehended.

Even viewed in the light most favorable to the defense, Simon's conduct constituted the *actus reus* of theft. His conduct was inconsistent with the scope of possession granted to customers — regardless of whether Simon had reached the outer door, or even the entrance to the vestibule, when he was stopped. Thus, under the specific facts of Simon's case, the judge's response to the jury was correct: any variation in the testimony on this point was irrelevant to Simon's guilt or innocence of theft.

Simon also argues on appeal that the jury instructions on the lesser offense of attempted theft were flawed. Given our resolution of the preceding issue, any error in the jury instructions on attempted theft was harmless.

We accordingly affirm Simon's second-degree theft conviction.

*We uphold the sentencing judge's rejection of mitigating factor (d)(9) — Simon's assertion that his conduct was among the least serious within the definition of second-degree theft*

Simon presents one further claim on appeal. At his sentencing, Simon contended that he was entitled to the benefit of the mitigating factor defined in AS 12.55.155(d)(9) — that his conduct in committing this offense was among the least serious within the definition of second-degree theft. The superior court rejected this proposed mitigator, and Simon now claims that the superior court's ruling was error.

The items that Simon stole were valued at slightly over $100. Normally, a theft of this amount would be the lesser crime of third-degree theft.[9] But because of Simon's prior theft convictions (two or more theft convictions within the preceding five years), his offense was elevated one degree. *See* AS 11.46.130(a)(6).

In arguing that his conduct was among the least serious second-degree thefts, Simon relies primarily on the fact the stolen items were worth $100 — *i.e.*, at the low end of the $50-to-$500 range covered by the version of the statute that was in effect at the time of his offense.[10]

In addition, Simon argues that, because he was living on the streets, and because he had very few skills he could use to make a living, the items that he stole — most notably, a jacket and a backpack — could be viewed as necessities for him. And Simon notes that he was cooperative with store personnel, and later with the police, after he was apprehended.

---

[9]    AS 11.46.140(a)(1) (theft of property valued between $50 and $500).

[10]    This statute, AS 11.46.140(a)(1), has since been amended: it now requires the government to prove that the stolen items were worth at least $250. *See* SLA 2014, ch. 83, § 5 (effective July 17, 2014).

It is true, as Simon argues, that the value of the things he stole was toward the low end of the range for his offense. But Simon's claim that he was merely trying to obtain necessities for his life on the streets is belied by his interaction with the store security officer when he was apprehended.

When Simon was apprehended, he handed the backpack and the DVDs to the Walmart employee, telling her, "There you go; there's your stuff. I'm sorry; I was going to sell it." In effect, Simon told the employee that he viewed the theft of the backpack and the DVDs as a commercial enterprise.

Nor was Simon being as forthcoming as he wished to appear. When he handed over the backpack and the DVDs, Simon still did not reveal that the jacket he was wearing was also stolen. This fact was only discovered later, when a police officer arrived to take custody of Simon. The officer noticed that most of Simon's clothes looked "dingy", but Simon's jacket looked new. And when the officer handcuffed Simon, he saw a store tag on one of the jacket's sleeves. Only then was the theft of the jacket revealed.

Given all of this, we conclude that Simon failed to prove that his conduct was among the least serious within the definition of his offense. [11]

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

[11] See *Michael v. State*, 115 P.3d 517, 519-520 (Alaska 2005), where the supreme court held that the question of whether mitigator (d)(9) is established under the facts of any particular case is an issue that an appellate court decides *de novo* — *i.e.*, without deference to the trial judge's ruling.